Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

## IV. GENERAL METHODOLOGY AND APPLICATION

### 1. Definitions

The following is a list of basic definitions of concepts used in the model and talent industry and in this report. Though comprehensive, the list is not absolute and terms, rates, services, and fees vary. Factors relating to the services of the model will vary and are unique in each case based on all relevant considerations relating to a particular model as well as to the client, product, event, or service advertised and to enable the negotiation by the agent for the highest rate possible given the type of product, service, or customer/consumer being advertised. For purposes of my professional reports, the following terms are applied as generally understood and accepted within the model and talent industry:

**Exclusivity** – Exclusivity is a term sought to restrict a model from working for a competing product; a higher rate would be negotiated to offset loss of work from similar clients.

**Exposure** - How broadly a Model's likeness will be circulated is taken into consideration in negotiating the fee.

**Fair Market Value** is an agreed price between a willing seller (the model and/or agent) and a willing buyer (client/advertiser).

**Length of Exposure of Usage** - the period of use, and any renewals or rollovers - a renegotiation or 'rollover' fee would be applied to usage longer than 12 months. There is no minimum usage period.

**Sensitive Subject Matter** - Certain products and services considered to be less reputable, unseemly, or embarrassing, resulting in a higher degree of compensation for talent agreeing to the use of their images with such products or services. For example, products and services relating to sexual or reproductive health, incontinence, adult entertainment, politics, and communicable diseases are sensitive subject matter. By way of example, an advertisement for a hemorrhoid cream would attract a large premium.

**Total compensation** - every form of usage is negotiated and is **negotiated before** the shoot. Usage is determined upon the ways the image(s) taken from the shoot are used. By way of example, distribution by way of billboard (i.e., an "Extra" "Usage") would pay more, if the image was placed on posters or banners, flyers, TV usage, movies, downloads, posters, hashtags, hangtags, and decorations additional fees would be incurred. **The general rule of industry is an additional Day Rate for each Usage.** Certain usages would command more and for every "Usage" a specific length of exposure time period would be specified. It is acknowledged that with total compensation as a starting point for a negotiation there may in some cases be a negotiated lower rate under certain circumstances. Multiple repeat bookings, loyal advertiser, exclusive bookings, and other factors could possibly be circumstances for which a lower rate may be negotiated.

11

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

**Unauthorized User** is a person, company, association or other entity or group of entities using the Model's image(s) without express authority of the model or her agent.

**Usage** includes the way and method of use and distribution of images including but not limited to advertising, social media, third party promotion, branding, billboard displays, coupons and more, more particularly:

> **Advertising** is use of an image to promote a business, company, or event on a website owned, controlled, or contributed to by a client or in a magazine or publication or anywhere the business or product name of the client is associated or attached with the image.
>
> **Social Media** includes, but is not limited to, Facebook, Twitter, Instagram, Google +, Yelp, YouTube, Snapchat and Tumblr.
>
> **Third Party Promotion** includes use of an image to promote a third-party product, company, event or consumer experience.
>
> **Branding** includes either manipulating an image to effectively "brand" a company and suggest a model is employed by the entity, or attaching dialogue or a hash tag (#) which references, describes, labels, or effectively categorizes a model and associates her/him to the particular product, business, or consumer experience, or similar products, business and consumer experiences.
>
> **Coupon** includes, but is not limited to, use of an image to offer discounts for entry, participation to a club, party or event or discounts on products.
>
> **Extra** usage would include billboards, flyers, TV usage, movies, downloads, posters, hangtags, banners, and decorations.

Additional terms used in this report, such as "**Day Rate**" are further discussed below and some of the concepts above are further elaborated upon below.

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

## 2. **Primary Factors Considered by Models Before Consenting to a Job**

There are two primary factors considered by models before consenting to a job:

1. The job/exposure/association with product and/or resulting images or tear sheets helps their career,

2. Compensation / payment.

Once a job has been negotiated (day rate plus usages) and the images are used on a website on the world wide web, the number of images from the shoot, the number of times used, the size of the images, the number of times the image was viewed or "liked" and the duration that the images remain available on a site are all factors that are outside the influence of the agent or model.

Once a model's job has been negotiated and shot the success of a campaign, the number of views, likes, and distribution are the responsibility of the client. Once an image is on the web and associated with an advertiser the number of views, the number of 'shares', the number of downloads, and copies made is generally unknowable.

13

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

### 3. Establishing a Model's "Day Rate"

The predominant way an authorized user could obtain images for advertising is to negotiate a contract first and arrange a photo shoot. All Usages should be negotiated prior to the actual use taking place. **It is critical to note that these Models do not sell pre-shot images for Advertising. All advertising for specific products involve a photo shoot.**

The basis of all negotiations in the industry is establishment of a "**Day Rate**" for work by the model. This is the base rate of compensation (determined by primarily by the three factors listed below) for the Model's time on the day of shoot.

1 - The Model's desirability, based on numerous factors, including the demand for his or her services and relevance to product.

>Models and Talent spend considerable years to develop their brand (brand or image) which is often based on fitness, beauty, and sexuality. Social Media followers, star rating, current press coverage, Marriage and personal relationships, current published work, TV appearances, Movie appearances, and Social Media attention must be considered.

>The number of Social Media followers has become extremely important in consideration of a Models' bookings. Endorsements for posts on their social media platforms is directly dependent upon the number of followers and audience engagement. A client's audience and customers recognition grows with the Model's growth in Social Media numbers as does the income for the commercialization of their image.

>For many other factors listed there is no quantitative measure available to add or detract value to a Model's day rate but should be considered in any negotiation. Much the same as a sportsman negotiating a new contract would consider the past seasons factors such as home runs hit, touchdowns scored, sacks achieved, etc.

2 - The Model's work history, such as prior associations, appearances, endorsements, and advertisements including rates established for the commercialization of their image.

>The Model's work history for an agent is the basis to help establish a "day rate" to quote in negotiations for future assignments. It is important to note that past "day rates" help establish a basis for future assignments but Models are constantly trying to raise their rates. Past rates will apply to similar product but each new assignment's rates will depend upon the Product to be advertised and factors as listed below.

3 - The nature of the business seeking a Model's service, including but not limited to the type of product, service, or customer experience.

14

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

  As noted above, the Day Rate is the basis of most model assignment negotiations. Models do not sell images previously shot to clients to be used in their advertising. Here, the only legal way Defendants could obtain the images of Plaintiffs is to 'book' the Model for a photo shoot after negotiations of rates and usages either directly with the Model or through an agent representing the Model. A Day Rate is also the basis of compensation for a model. Time spent on set is calculated as the Day Rate. In this case the Defendants did not engage the models in a photo shoot but misappropriated the images. The Day Rate is calculated into Fair Market Value.

  The product being advertised is the main factor considered to determine a day rate. The "Product" being advertised by Defendants is the Club as well as events, parties, gatherings, food, and alcohol being sold at the Club. The model herself is also being promoted as an endorser of the Club, a patron of the Club, an employee of the Club, and possibly being in attendance at the Club or its events.

  The demand for a model's service, her history of work, her "fame," her Social Media standing, and her suitability to represent the product and compatibility with the advertiser's vision for their marketing plan are the next considerations.

  To be portrayed as or appearing to endorse this Club is not an assignment that enhances a model's career and resulting images are not something they would display in a portfolio. The possible damage to a model's career and the connotations attached to being portrayed as a customer, a consumer, or an employee at the Club – a strip club – could affect and taint attitudes from future potential clients.

  Models accept assignments that help their careers such as magazine work that raises their profile and which supplies well produced images mostly shot by accredited photographers. Models accept work that pays fair market value rates in line with the product they are advertising.

  Appearing in advertisements for Defendants' strip club does not 'benefit' the Models' career and thus would only be considered for the monetary payment.

  All of the Models in this case have shown careers and resultant earnings based on the commercialization of their image. The Day Rates I have quoted are all based on the fact that the Model herself is also the product being offered by Defendants but each Model's Day Rate varies according to the Model's work history. Rather than just 'creating' a Day Rate I have tried to draw as straight a line from previous earnings for one day work for as similar products as possible.

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

### 4. <u>**Additional Elaboration on "Usages" in the Model & Talent Industry**</u>

Once the Day Rate for each model has been established, the further costs to the Advertiser depends upon the "Usages." A Day Rate for each Usage is the basis of most negotiations in the model and talent industry.

It must be noted that Usages as described here are categories of use not the number of times an image is posted. In fact, once a negotiation has taken place and a contract agreed to, images produced from the photo shoot can be used in the particular Usage categories an unlimited time in the agreed time period.

Advertising usage is included as the use when attaching the Advertiser's name to the Model's image and is included in the Day Rate as paid for the model's time on set. This also allows the advertiser to use the images produced on their business website. In other words, an advertiser can engage the Model, produce images, attach their name and use on their website for one Day Rate total. All other Usages – in particular distribution on social media – will be negotiated additionally.

In offering my opinion of fair market value, I do not charge a rate for the number of times an image is posted on social media but I do quote one Day Rate for the social media method of distribution as is common in the model and talent industry. In this case, social media is the method of distribution of the Models' images.

"Branding" is a category of use that is also included in my fair market valuation when warranted and would be negotiated before a model was photographed. Models advertise product. The majority of work performed by the Models in this case is advertising products such as clothes, swimwear, lingerie, costumes, beverages, and beauty products. When a client mentions 'product' in their descriptions or tagged language or labels or banners, that client is referring to the product. If the Club is advertising the Models as the product any reference to the product in these advertisements becomes a personal reference to the Model and is termed Branding. Branding ties the Model to the establishment, makes the advertisement a personal endorsement, implies that the Model will be in attendance at the Club, works at the Club, is available for patrons of the Club, or describes services that the Model would be performing at the Club. Branding use is quoted at a rate equal to the Model's Day Rate and is charged once, no matter how many times "Branding" language is used.

"Coupon/Third Party" use is when a Model's mage is used to promote special deals over and beyond the original product agreement. It is my understanding that alcohol sales are part of the product in the case of bars, restaurants, and clubs including gentlemens/strip clubs but when the advertisement includes the image or the logo of a particular Name Brand Alcohol this becomes a "Third Party" advertisement. Alcohol advertisements are closely monitored by the Advertising Counsel. Minimum age of 25 and other factors that can affect a Model's ability to work must be considered. Alcohol advertising for a model is always a lucrative option for work but a certain degree of exclusivity must be adhered to. Clients do not want to see the same model endorsing many different brands of alcohol and it is an agent's duty to disclose conflicts to

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

potential advertisers. Coupon/Third Party Usage when applicable is quoted at a rate equal to the Model's Day Rate and is charged once, no matter how many times Coupon/Third Party is used.

      Usages and the rates charged for usages are defined and negotiated before the shoot takes place. Usage rates may be calculated and an "all up rate" may be quoted but make no mistake the rates have been calculated and negotiated first based on the quoted "Day Rate." Some contracts may not break down the rates determined for "Usages" but those rates have been considered in the total rate charged.

      The modelling industry and photographers representation have been around for over 75 years and the method of negotiations of Day Rates, the way Day Rates have been determined, Usages and the way in which they are charged have also been in use and are still used in nearly every agency in every country around the world.

      I thus apply model and talent industry standards to the determination of fair market value in cases of misappropriation and use of images.

      Further modelling industry terms and conditions and reference websites are described in the references section of this report.

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

### 5. Additional Factors Considered in Establishing Fair Market Value

The rates that models are paid are based upon numerous additional factors including but not limited to the following:

- whether use exclusivity is sought;

- whether the product or service constitutes or is related to sensitive subject matter;

- the history of the client or industry seeking a model's services, the style, quality, and production of previous advertising and promotions, and the client's history in the hiring of other model's and celebrities;

- exposure - namely how broadly a model's likeness will be circulated;

- the type of exposure, or the "Usage" of the image;

- the length of exposure of Usage, the period of use, and any renewals or rollovers;

- the nature, duration and location of the actual shoot and production.

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

### 6. <u>Assessment of Fair Market Value Damages</u>

A Day Rate for the Defendants' use in a hypothetical negotiation should at a minimum be equal to the value set by previous commercialization of Model's image in combination with other factors that would influence the actual quoted or negotiated rate for a day's rate. Then applying that Day Rate to the specific Usages as used by Defendants yields total fair market value compensation.

In determining the potential impact to a Model's career and future prospects of gaining work from reputable organizations and clients, there are a number of factors that must be taken into consideration. Models invest heavily in time, work, and money to build their image and publicity value. Non-negotiated use of their images undercuts these investments, depriving the model of the opportunity to control and craft their own brand as sole owners of their image. This impact would be considered in valuing a Model's rate.

If a Model's image is unilaterally used by an Unauthorized User and that party does not pay at least the full fair market value that the image would otherwise achieve in a bilateral negotiation, the Model is immediately adversely affected financially. In the case of the image being used to promote an industry or product that does not enhance the Model's known and accepted image, the future income earning potential of the Model could be severely, and in some cases permanently, damaged thereby destroying the future career prospects of the Model. Models and clients take the potential for such harm into account when negotiating a Model's rate.

If a User opts not to engage in arms-length negotiation for the image and, instead, uses the Model's image without consent, an assessment of financial damages to the model must include, at a minimum, the fair market value for the image had it been negotiated properly. In a real-world market negotiation the model or agent would need to consider the possibility of loss to future earning capacity and possible damage to reputation of being associated with a product that is often deemed unsavory. In an effort to provide a conservative assessment of the fair market value of the Models' images, no additional "premium" has been added because Defendants failed to ask first. However, the Defendants' "product" has been considered in the establishment of Models' hypothetical negotiated Day Rate for use of their imagery by the Club.

The timing or context of the use of the photographic images of the model, the product advertised, the Usages, and the distribution of the images to various markets all must be taken into consideration in the assessment of damages and the number of shoot days required to obtain the images used and the usage of each image must be taken into account for the purpose of establishing a fee in an arms-length negotiation. For each Model a fair market fee for the use of each shoot days' worth of images used, taking into account the income history the model derived from properly negotiated work over the course of her career, as well as their work quality, experience, exposure, and duration of career forms part of the calculation of the day rate. The determined fee would be that which is reasonable in light of industry standards, the way each Models' image was used, and the nature of the business that has misappropriated the image.

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

### 7. <u>Categories of Documents and Information Considered in Forming Opinions</u>

In conducting the analysis to complete an assessment of damages, it is necessary to review, consider, and rely upon the images used and their specific Usage by the Defendants together with alterations to any of the used images, the media in which each image was used or disseminated, and the mode and scope of distribution in various markets nationally and worldwide on the web. My understanding is that none of the images were taken down prior to the beginning of litigation activity between the parties.

In conducting an analysis in preparation of a report it is further necessary to review, consider, and rely upon the type and caliber of past clients that have employed each Model as well as factors determining and affecting each Model's future earning capacity such as earning history, development, growth, positioning, experience, current exposure, name recognition, personal publicity, social media profile and web presence, market demand, and complementary employment. In addition to having extensive knowledge and experience in the modeling industry it is necessary to have, to the extent available, considered such documents as modeling contracts and agreements, contractor 1099 forms, employee W-2 forms, earnings statements, releases, and related records when available. Discussions with the Models and best recollection of work and earnings are discussed and considered where invoices, documents, contracts, or payment records are not available but the resulting work product is available.

Discussion with the current agent or past agents representing the Models when available is valuable in assessing the value of a Model's image. This process and knowledge as to the history of rates, comparables, career planning, special circumstances, exclusivities, competing products, and name endorsements are integral to determining and negotiating the value of a Model's image. I have attempted to contact where available all agents or representatives, managers, booking companies, or attorneys that have knowledge and details that are important in establishing a working Day Rate with regards to use of the Model's images to advertise the Defendants' product.

Review, consideration, and reliance upon information and literature relating to the Defendants' history, profile, and focus on promoted events, including but not limited to social media promotional material is also required to gain an understanding of the specific product or consumer experience that the Defendants advertise. Defendants' use of the Models' images implies that the Model is a willing and voluntary participant and endorser of the Club and the use implies that the Model necessarily understood and supported the use by Defendants and the consumer experience being advertised. Such use can imply that each Model took part in or would be present at the Defendants' Club and its parties or events in fulfillment of this advertised consumer experience.

Report of Stephen Chamberlin
*Lopez et al. v. Meyers G.M. Enterprises et al. dba Cajun Club*

### 8. Additional Professional Considerations

In conducting the analysis and preparation of a Report, I further review, consider, and rely upon my 30+ years of involvement in the model industry as well as discussions with numerous past and present agents working in agencies all over the world. I review various booking terms and conditions set down by model agencies operating today (reflective of nearly every agency operating worldwide) and handbooks and guidelines published by advisory bodies such as The Association of Model Agents (AMA), The Trade Association of The UK Model Industry.

In determining my fair market value damages opinions here I employ the normal model industry practice and process of taking into account the Models' time to photograph and the charges to a company or other entity that is interested in contracting the Models' services. Fair market value of a product or service is the agreed price between a knowing, voluntary, and willing seller and a knowing, voluntary, and willing buyer, with no interference, disruption, or manipulation by a third party. Fair market value is not equivalent to the value that a buyer would unilaterally offer and pay for use of an image to promote a product, service, or consumer experience where the seller – in this case the Models – either does not know about the transaction or objects to or rejects the proposed transaction. In other words, a hypothetical buyer like the Defendants in this case would not be able to unilaterally set the fair market value of the Models' images in a transaction, particularly where, as here, there is not a willing seller. Nor would the seller be able to unilaterally set the price for the Defendants' use of the Model's image. If that were the case, I understand that the Models in this case would have set prices far higher than my opinion of fair market value assuming the Models would agree to Defendants' use of their imagery to advertise Defendants' strip club at any price.

Comparison of rates paid to Models for assignments worked where they have consented to the job, agreed with the product, and have had a rate negotiated before the assignment present significant differences with the unauthorized and unnegotiated use of their images by Defendants.

In assessing fair market value I have not included a fee or rollover based on time. Rarely, if ever, is there a contract with unlimited time for use allowed. Many of the images used by Defendants may have remained on Social Media for significant periods of time, with no indication that the Defendants would have intended to remove the imagery before being contacted in this litigation. Thus, Defendants had effectively used the Models' images for an "unlimited" duration. In my experience there would be a renegotiation or rollover (repayment of original fee) at minimum every year of use, but the value of such rollover is not included in the totals I provide in this report.

In development of my report I have conferred with certain modeling agents in the main modeling markets of the US.