IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ARIANNY CELESTE LOPEZ, *et al.*,

                        Plaintiffs,              OPINION AND ORDER

    v.

                                                               21-cv-657-wmc

MEYERS' G.M. ENTERPRISES, INC., *et al.*,
d/b/a CAJUN CLUB,

                        Defendants.

---

      This case is set for a jury trial commencing September 26, 2023, with a final pretrial conference ("FPTC") to occur in person at 3:00 pm tomorrow. The court issues the following opinion and order on plaintiffs' motion for witnesses to appear at trial via videoconference and defendants' Meyers' G.M. Enterprises, Inc., and R&N Enterprises, Ltd. (collectively, d/b/a "Cajun Club")[1] motions in limine to exclude the opinions of the plaintiffs' expert witnesses. For the reasons explained below, the court reserves ruling on plaintiffs' motion to allow remote testimony pending more information from the parties; it denies defendant's motion to exclude Stephen Chamberlin's expert opinion entirely but reserves as to Chamberlin's use of a multiplier; and finally, the court denies the Club's motion to exclude Thomas Maronick's expert opinion.

---

[1] The parties both use a colloquial name, "Cajun Club," to describe the defendant businesses. The court also adopts the name for the purposes of this opinion and order. Notably, the parties further refer to the defendant businesses as "defendant" consistent with the case caption above. Accordingly, the court will discuss with the parties to confirm whether the listed defendants are actually one entity. For the purposes of this opinion and order, aside from the caption and first reference, this opinion refers to Cajun Club as "defendant."

OPINION

**I. Plaintiffs' Motion to Allow Remote Testimony (dkt. #37)**

Plaintiffs seek to allow witnesses to testify at trial via videoconference, pointing out that many of the plaintiffs live far away and have children. Cajun Club responds that the plaintiffs have not established "good cause in compelling circumstances" for remote testimony under Federal Rule of Civil Procedure 43(a), noting that they filed the action in Madison and should have known that they would be required to appear in person for trial. Cajun Club contends that remote testimony would prejudice it because the jury would be unable to judge the demeanor of the plaintiffs via videoconference.

Consistent with Rule 43(a), the court would normally require personal appearance of the parties at trial, but there is an element of insult to injury in this case: with the defendant having apparently engaged in the unauthorized use of plaintiffs' images, requiring those same plaintiffs to appear in person in Madison to pursue their claims is arguably a further insult, if not injury. Moreover, the use of videoconferencing has become ubiquitous since the COVID pandemic and has proven generally effective. Finally, the defendant appears to concede the unauthorized use of the plaintiffs' images, with the plaintiffs only asserting that their presence is required to assess damages – specifically, their claim of a diminution of value in their images, which may well be cumulative depending on how the plaintiffs intend to present it. On the other hand, the only authority that plaintiffs cite in support of their motion is from this court's pre-pandemic decision in *Hall v. Boston Scientific Corp.*, No. 15-cv-338-bbc, 2015 U.S. Dist. LEXIS 120031 (W.D. Wis. Sept. 9, 2015), which, as defendant points out, concerned video testimony of non-parties,

and a wholly inapplicable state criminal case in which the defendant *consented* to appear by videoconference for a plea. In substantial part then, this motion turns largely on which, if any, plaintiffs will be called in their case-in-chief and the compelling reason for those witnesses' non-appearance.

Accordingly, ruling on this motion is RESERVED pending clarification from the parties about the intended use of plaintiffs' testimony including: whether the plaintiffs intend to call affirmatively any plaintiffs as witnesses; the likely extent of cross-examination; which witnesses would be presented remotely and why; and any additional legal authority or compelling factual cause for the plaintiffs being relieved of appearing in person.

**II. Defendant Cajun Club's Motions in Limine**

The standard for reviewing this challenge is a familiar one, principally governed by Federal Rule of Evidence 702, as elucidated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

In applying Rule 702, a district court is to function as a "gatekeeper," determining whether a party's proffered expert testimony is relevant and reliable. *Daubert*, 509 U.S. at 589; *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (expert testimony must be "not only relevant, but reliable" (quotation marks omitted)). Although "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), expert testimony must, therefore, satisfy the following three-part test:

> (1) the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702;
>
> (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and
>
> (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Still, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### A. MIL 1: Motion to Exclude the Expert Opinion of Stephen Chamberlin (dkt. #32)

In this *Daubert* motion, Cajun Club seeks to exclude the opinions of the plaintiffs' image valuation expert, Stephen Chamberlin, on three grounds. First, it argues that Chamberlin is unqualified to provide an objective estimate of the price of the photographs

4

because, as the plaintiffs' agent, his job is to secure the highest possible price, and he has no experience pricing *specific* images in the adult entertainment industry and does not have a degree in marketing. Second, Cajun Club argues that Chamberlin calculated the damage amounts out of "thin air," improperly inflating his damages calculations by using the plaintiff models' highest-paid previous jobs for organizations with significantly more public exposure than Cajun Club. Third, the Club appears to assert that Chamberlin improperly multiplied the damages calculation.

Plaintiffs respond that Chamberlin's extensive experience as an agent for models makes him well-qualified to offer expert testimony on the value of the photographs and that he reliably applied industry principles to the plaintiffs' circumstances. Finally, the plaintiffs argue that Chamberlin's testimony would be helpful in measuring fair market value because negotiating and pricing modeling jobs is a specialized skill.

While Chamberlin's opinions are obviously open to criticism, the court concludes that they pass the *Daubert* test, with one exception. As an initial matter, Chamberlin has 30 years' experience as an agent in the "model and talent" industry and has represented over 3,000 models, which establishes that he is well-qualified to testify about the fair market value of the plaintiffs' images. *See Ervin*, 492 F.3d at 904; (dkt. #25-2 at 1.) Principally, the defendant criticizes Chamberlin's qualifications because his work involves negotiating on behalf of models, and hence is biased, but it also establishes his credentials to speak as to this industry and manner of arriving at valuation, something with which a lay jury has no experience. While Cajun Club also criticizes his attempt to value the misappropriation of a single image, they ignore his explanation that plaintiffs would never

5

authorize this kind of use. Thus, Chamberlin is attempting to create a hypothetical negotiation, something damages experts do as a matter of course in intellectual property cases.

Moreover, Chamberlin's methodology is well-explained and arguably reliable. His report explains that the day rate for Cajun Club's use of the plaintiffs' photographs in a hypothetical negotiation would "at a minimum be equal to the value set by previous commercialization of Model's image in combination with other factors that would influence the [day rate]." (Dkt. #25-3 at 9.) Chamberlin uses the plaintiff models' desirability, work history and the nature of the business seeking her services to calculate the day rate. (*Id.* at 4-5.) In fairness to the defendant, the terms of some of the sample contracts that Chamberlin relies on as a reasonable proxy for calculating the day rate require more than a one-day photoshoot, which supports the defendant's criticism that he may be overstating the plaintiffs' payment history for such a photoshoot, but that is an issue that the Club can address on cross-examination. *See Daubert*, 509 U.S. at 596; (*e.g.*, dkt. #25-10 at 3.) And, again, this hypothetical is only necessary because of defendant's violation of copyright law.

Chamberlin goes on to explain that once the day rate for a model has been established, the further costs depend on the number of usages, which are categories of "use" not the number of times an image has been posted. Chamberlin then identifies four categories of "use" including advertising, social media, branding and coupon/third party. (Dkt. #25-3 at 6-7.) In short, Chamberlin's expert opinion is admissible under Rule 702 because he is qualified, explained the methodology and basis—albeit a subjective one—for

his calculations, and is likely to be helpful to a jury given the unique nature of the "modeling and talent" industry.

Cajun Club cites several cases where other courts criticized or excluded Chamberlin's testimony, but these cases are both non-binding and obviously, factually distinguishable. *See Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 254-55 (2d Cir. 2021) (holding that the district court did not abuse its discretion in excluding Chamberlin's report as "speculative and methodologically unreliable" because it overstated plaintiffs' payment history and unjustifiably multiplied the damages); *Gibson v. BTS North, Inc.*, No. 16-24548-CIV, 2018 WL 888872, at *10-11 (S.D. Fla. Feb. 14, 2018) (concluding that the court could not rely on Chamberlin's report at summary judgment because he did not explain how he calculated the damages); *Gibson v. Resort At Paradise Lakes, LLC*, No. 8:16-CV-791, 2018 WL 10373435, at *17 (M.D. Fla. Feb. 2, 2018) (concluding that Chamberlin's application of a "3X multiplier" was "speculative, unsupported and unreliable," but finding that Chamberlin's testimony established a value for use of plaintiffs' photographs). At most, these decisions only underscore that evaluation of expert testimony involves discretion and must be determined on a case-by-case basis. In any event, Chamberlin's expert report in this case does not suffer from many of the issues in the adverse cases described above. Specifically, in his report in this case, Chamberlin lays out his method for calculating damages, and he specifically explains why he multiplied the damages for additional use. Of course, the defendant can challenge Chamberlin's methodology in cross-examination, but the motion to exclude his expert opinion altogether is DENIED. Still, the court will RESERVE IN PART as to Chamberlin's use of a multiplier

which appears to have inadequate support in his report and will hear from the parties at the PFTC.

### B. MIL 2: Motion to Exclude the Expert Opinion of Thomas Maronick (dkt. #33)

Maronick's report describes the methodology and results of a survey gauging consumer perceptions about the plaintiffs' images used in promotional materials for the Cajun Club.  Cajun Club asserts that Maronick's report is based on flawed methodology because he did not use the actual promotional materials at issue, include plaintiff Brenda Geiger in the survey or provide any information about how he recruited survey responders. Defendant adds that the survey did not allow the respondents to identify the women in the advertisements, so there was no way to verify whether they actually recognized the plaintiffs.  Further, it asserts that the survey was flawed because it used ambiguous terms, like "events," when it asked whether respondents believed that the women in the pictures participated in events at the Club and prejudicial terms, like "ads," to describe the pictures.

In response, plaintiffs assert that Maronick's survey used the actual Cajun Club advertisements, included pictures of Geiger, and described the respondent recruitment process.  The plaintiffs further assert that, at most, the lack of an open-ended "name that model" question went to the weight of the survey.  Finally, the plaintiffs argue that the survey did not need to define the term "event" and that calling the pictures "ads" was accurate.

The court concludes that Maronick's testimony is admissible.  First, Maronick is well-qualified as a professor of marketing and having worked as a marketing expert with

the Federal Trade Commission. (Dkt. #24 at 2.) Second, he applied these professional experiences in designing the survey and, although Cajun Club states otherwise, the survey did include Cajun Club's promotional materials and pictures of Geiger. (Dkt. #24 at 3; Dkt. # 24-5 at 5; Dkt. #25-6 at 4.) Maronick's report also describes how he recruited respondents for the survey, "the sample [was] drawn from the Vanguard internet panel of individuals who have agreed to participate in internet surveys on a periodic basis." (Dkt. #24 at 5.) Although the report does not indicate whether survey respondents were paid, that issue goes to the weight of the survey, not its admissibility. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (stating that it is rare that a survey is so flawed that it is inadmissible and that "shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact."). Similarly, any flaws in the survey related to the lack of an open-ended question about the plaintiff models' identity and the use of the terms "event" and "ads" also go to the weight of the survey. *See id.* Third, Maronick's testimony will likely be helpful to the jury in determining whether Cajun Club used the pictures in a manner that is likely to cause confusion, while Cajun Club can highlight any of the survey's flaws and limits through cross-examination. Accordingly, that motion is DENIED.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion in limine (dkt. # 37) is RESERVED as set forth above.

2) Defendant's motion in limine to exclude the opinions of Stephen Chamberlin (dkt. #32) is DENIED IN PART and RESERVED IN PART.

3) Defendant's motion in limine to exclude the opinions of Thomas Maronick (dkt. #33) is DENIED.

Entered this 12th day of September, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge